# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **LARRY FLOYD and TANYA FLOYD,** | ) | |
| | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-06-S-542-NE** |
| | ) | |
| **BANKSTON MOTOR HOMES, INC.,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND FINAL JUDGMENT

Plaintiffs Larry and Tanya Floyd brought suit against Bankston Motor Homes, Inc. ("Bankston") and Western Recreational Vehicles, Inc. ("Western"), after plaintiffs purchased an allegedly defective motor coach from Bankston that was manufactured by Western. Plaintiffs allege that Bankston and Western breached implied warranties of merchantability and fitness for a particular purpose, causing damages arising out of the purchase of the motor coach. Plaintiffs also are seeking to enforce their revocation of acceptance pursuant to Alabama Code §§ 7-2-608 and 7-2-711 (1975). Plaintiffs voluntarily dismissed their action against Western on May 8, 2006.[1] This action now is before the court upon the parties' cross-motions for summary judgment (doc. nos. 28 and 29).

---

[1]*See* doc. no. 14.

## PART ONE

### *Summary Judgment Standard*

Federal Rule of Civil Procedure 56(c) provides, in part, that summary judgment not only is proper, but also that it "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322(1986).

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.
>
> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting

*Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)); *see also United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (*en banc*).

## PART TWO

### *Summary of Relevant Facts*

Plaintiffs purchased a new 2003 Alpine Motor Coach ("Coach"), VIN 18FX4EM2631174694, from defendant Bankston on May 7, 2004.[2]  The purchase price of the Coach was $257,988, which included sales tax of $8,088.88.[3]  Plaintiffs financed $220,000.00 of the purchase price of the Coach through *E\*Trade Consumer Finance Corporation* pursuant to a retail installment contract and security agreement.[4] The interest rate at which the Coach was financed is 5.5% per annum, and calls for 240 payments of $1,513.35 a month.[5]  As of January 2007, plaintiffs had paid $22,752 in interest under the retail installment contract.[6]  The plaintiffs were required to purchase an extended warranty for the Coach at a cost of $4,195 in order to obtain the lower financing rate of 5.5 percent.[7]  Plaintiffs purchased and installed a tow bar on the Coach at a cost of $1,252.17, and a set of window and tire sunscreen covers

---

[2]*See* doc. no. 30 at 1.

[3]*See id*. at 2.

[4]*See id.*; *see also* doc. no. 34 at 1-2.

[5]*See* doc. no. 30 at 2.

[6]*See id*.

[7]*See id.*

at a cost of $673.10.[8]

Prior to leaving Bankston's dealer lot, plaintiffs discovered that the hot water system was not working.[9]  Representatives from Bankston and a nearby repair shop determined that the water system had been plumbed incorrectly by the manufacturer.[10] It was determined that the plumbing problems would require substantial work.[11] Plaintiffs were unwilling to wait while Bankston arranged for the appropriate repairs, so the parties agreed that the plumbing repair work would be done by an Alpine dealer in Arkansas.[12]

On the trip from Alabama to Arkansas after purchasing the Coach, the light fixture above a table fell down while plaintiffs were driving and dented the table's wood top.[13]  McGaugh RV, an Alpine dealer in Arkansas, made the necessary repairs to the plumbing and replaced the light fixture, and table.[14]  After repairs were made to the hot water system, light fixture and table, plaintiffs took the Coach on a trip from Arkansas to Michigan.[15]  The Michigan trip lasted approximately one week.[16]

---

[8] *See id.* at 2-3.

[9] *See id.* at 3.

[10] *See* doc. no. 30 at 3.

[11] *See id.*

[12] *See id.*; *see also* doc. no. 34 at 2-3.

[13] *See* doc. no. 30 at 3.

[14] *See id.*

[15] *See id.* at 4.

[16] *See id.*

4

Plaintiffs experienced many problems on this trip, including:

(a) the ice-maker hose broke, leaking water into the lower areas of the Coach;

(b) two of the three slide-outs leaked and mildewed the carpet;

(c) the automatic entry step into the Coach malfunctioned;

(d) a rivet on the exterior pulled out and damaged the fiberglass fender;

(e) the cable television system did not work;

(f) the lock on the entry door to the Coach malfunctioned making it difficult, if not impossible, to open the door; and

(g) electrical components such as lights, fans, and stereo failed to work properly.[17]

The Coach is equipped with hydraulic jacks that allow it to be leveled when parked, and an alarm which is intended to warn the driver that the jacks are lowering so that the driver will not move the Coach at that time.[18]  The jack warning alarm malfunctioned several times on the Michigan trip even though plaintiffs were not attempting to lower the jacks.[19]  The malfunctioning jack warning alarm caused plaintiffs to have to stop several times along the road.[20]  Plaintiffs had to disconnect

---

[17]*See* doc. no. 30 at 4.

[18]*See id.* at 4-5.

[19]*See id.* at 5.

[20]*See id.*

5

the jack alarm module from the electrical panel just to keep going.[21]  In the week that they were on the Michigan trip, plaintiffs spent an inordinate amount of time either stopping to try to fix a problem themselves, looking for repair shops that could make repairs, or waiting at repair shops.[22]

Plaintiffs contacted Bankston upon their return to Arkansas from the Michigan trip concerning the various problems with the Coach.[23]  Plaintiffs contend that Bankston representatives instructed them to take the Coach to McGaugh RV for the appropriate repairs.[24]  The Coach was at McGaugh RV for approximately twelve weeks for repairs.[25]

Plaintiffs took the Coach on an eight-day trip from Arkansas to Colorado in September of 2004.[26]  On that trip, the largest awning on the Coach began to break open from the side as plaintiffs were driving, causing them to make an emergency stop to secure it from further release.[27]  Descending from approximately 7,000 feet

---

[21]*See id.*

[22]*See* doc. no. 30 at 5.

[23]*See id.*

[24]*See id.* at 5-6.  Defendant admits that on various occasions in late 2004 and early 2005, it suggested that the repairs be performed at McGaugh RV, but this was only based upon the advice of the manufacturer and warrantor of the motor home, Western Recreation Vehicles, Inc.  *See* doc. no. 34 at 4, ¶ 25.

[25]*See* doc. no. 30 at 6.

[26]*See id.*

[27]*See id.*

6

near the Continental Divide on the Colorado trip, the Coach experienced a sudden and unexpected loss of radiator fluid.[28]    The radiator fluid loss occurred on a Sunday.[29]  Plaintiffs had to constantly monitor coolant levels, purchasing three to four gallons of coolant at each stop they made.[30]    The engine maintenance light for the Coach was constantly on, and white smoke constantly emitted from the exhaust as the Coach was experiencing low torque.[31]

Plaintiffs had to cut their Colorado trip short to return to Arkansas because of the problems with the Coach.[32]    Plaintiffs contend that Bankston representatives instructed them to take the Coach to McGaugh RV for repairs to the awning and to Shipley Motors, a Cummins diesel shop, for repairs to the engine.[33]  The Coach also had problems with the paint job and plaintiffs informed Bankston of that as well.[34]  Repairs to the awning and radiator took four months to complete, because the manufacturer had to fabricate the parts.[35]

---

[28]*See id.*

[29]*See id.*

[30]*See* doc. no. 30 at 6.

[31]*See id.* at 7.

[32]*See id.*

[33]*See id.* at 7.  Defendant admits that on various occasions in late 2004 and early 2005, it suggested that the repairs be performed at McGaugh RV and Shipley Motors, but this was only based upon the advice of the manufacturer and warrantor of the motor home, Western Recreation Vehicles, Inc.  *See* doc. no. 34 at 5, ¶ 34.

[34]*See* doc. no. 30 at 7.

[35]*See id.*

Plaintiff Larry Floyd wrote a letter in January 2005 to Western RV, copying Bankston, requesting that they either steeply discount the purchase price of the Coach or repurchase the Coach.[36]  Larry Floyd was in constant contact with Harrison Bankston, owner of Bankston Motor Homes, during the four-month repair period.[37] Plaintiffs picked up the Coach from McGaugh RV on February 3, 2005, after McGaugh had made some repairs and took it to Shipley Motors for a determination of the problems with the engine.[38]  At Shipley Motors, over twenty "fault" codes appeared when they ran a diagnostic check on the engine.[39]

Plaintiffs contend that Harrison Bankston assured them the repair shops in Arkansas could fix the problems, and that he would contact Western on their behalf to expedite matters.[40]  Plaintiffs further contend that Harrison Bankston agreed that it would not be practical to service the Coach in Alabama, and that plaintiffs should use McGaugh RV in Arkansas instead.[41]  Defendant contends that it offered to pick up the motor home in Arkansas and bring it to the Bankston repair shop in Huntsville, Alabama to repair any remaining defects.[42]  Plaintiffs dispute that this offer was ever

---

[36]*See id.*; *see also* doc. no. 34 at 5.

[37]*See* doc. no. 30 at 8.

[38]*See id.*

[39]*See id.*

[40]*See id.*

[41]*See id.*

[42]*See* doc. no. 34 at 7.

made.[43]

The Coach remained in the shop at either McGaugh RV or Shipley Motors from September 2004 until January 2006; even then, all problems were not repaired.[44] Plaintiffs, through counsel, attempted to revoke acceptance of the motor home by letter dated February 13, 2006.[45]  From January until the first week of October 2006, the Coach either sat on a repair lot or was stored.[46]  The Coach was driven only when a Bankston mechanic came to Arkansas to drive it to Huntsville, Alabama for Bankston's inspection prior to the mediation of this case which took place on October 6, 2006.[47]  Since purchasing the Coach, plaintiffs only drove it approximately 5,000 miles, and have been able to use it for only about fifteen days.[48]

Plaintiffs contend that the Coach's defects were solely the result of the defective condition of the Coach.[49]  Defendant disputes this, and points to the affidavit of Ricky Cornelius, President of Performance RV, who inspected the motor home on October 19 and 20, 2006.[50]  According to Mr. Cornelius, repairs to the

---

[43]See doc. no. 35 at 2.

[44]See doc. no. 30 at 8-9.

[45]See doc. no. 30 at 9, Exh. 5; doc. no. 34 at 7, ¶ 44.

[46]See doc. no. 30 at 9.

[47]See id.

[48]See doc. no. 30 at 9.

[49]See id. at 9-10.

[50]See doc. no. 34 at 8, ¶ 50.

Coach had been professionally performed, and it appeared that the Coach had been damaged by rodents or animals at some point.[51]  Plaintiffs claim they have incurred costs in the total amount of $305,163.20.[52]  Plaintiffs further maintain that the Coach still has not been repaired despite being in various repair shops for approximately 18 months.[53]  Bankston contends that it was not afforded an opportunity to repair the alleged defects until seven months after plaintiffs attempted to revoke their acceptance, and after suit was filed.[54]  Once given that opportunity, Bankston asserts that no defects remain that substantially impair the value of the Coach.[55]

**PART THREE**

*Discussion of Plaintiff's Claims*

**A.    Revocation of Acceptance**

Plaintiffs move for summary judgment arguing that they are entitled to revoke acceptance of the Coach as a matter of law.[56]  Plaintiffs seek to revoke acceptance of the Coach pursuant to Alabama Code § 7-2-608 which provides:

> (1)  The buyer may revoke his acceptance of a lot or commercial unit whose nonconformity *substantially impairs its value to him* if he

---

[51]*See* doc. no. 33, Cornelius Affidavit at ¶¶5-6.

[52]*See* doc. no. 30 at 10.

[53]*See id.* at 17.

[54]*See* doc. no. 34 at 11.

[55]*See id.* at 11-12.

[56]*See* doc. nos. 29 and 30.

has accepted it:

> (a)  On the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; or
>
> (b)  Without discovery of such nonconformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.
>
> (2)  Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects.  It is not effective until the buyer notifies the seller of it.
>
> (3)  A buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them.

Ala. Code § 7-2-608 (1975) (Repl. Vol. 2006) (emphasis supplied).

Defendant argues that revocation of acceptance is not appropriate because the value of the Coach has not been substantially impaired, and because the attempted revocation of acceptance did not occur within a reasonable period of time.

Under the circumstances outlined above, however, the court finds that notification of plaintiffs' revocation of acceptance occurred in a reasonable time.  The fact that notification occurred in February 2006 (nineteen months after purchasing the Coach) is not dispositive, given that the Coach remained in various repair shops about 18 months, and defects remained.  *See Koch Supplies, Inc. v. Farm Fresh Meats, Inc.*, 630 F.2d 282, 286 (5th Cir. 1980) (applying Alabama law and holding that attempted

revocation six months after purchase was reasonable in view of the continuing repair efforts); *see also Tiger Motor Company v. McMurtry*, 284 Ala. 283 (1969) (finding revocation eight months following purchase after repeated attempts to repair had failed was within a reasonable time); *Ford Motor Credit Co. v. Harper*, 671 F.2d 1117, 1124 (8th Cir. 1982) (applying Arkansas law and holding that revocation approximately 17 months after acceptance of tractor was reasonable where repeated attempts were made to repair).

Whether there is a substantial impairment of value usually is a question for the trier of fact.  *See Dickson v. U-J Chevrolet Co.,* 454 So.2d 964, 966 (Ala. 1984). Factors to consider are the extensiveness of the repairs, the actual use and ability to use the vehicle, and the success of the repair.  *See id.* Defendant attempts to highlight a material fact dispute concerning whether the Coach is now repaired, even referring to the report of Ricky Cornelius, President of Performance RV, who inspected the motor home on October 19 and 20, 2006.[57]  The relevant period of time to determine substantial impairment, however, is at the moment of revocation.  *See Page v. Dobbs Mobile Bay, Inc.*, 599 So. 2d 38, 43 (Ala. Civ. App. 1992).

It is undisputed that as of February 2006 (almost two years after purchasing the Coach), plaintiffs had only been able to take two short trips, and those trips were

---

[57]*See* doc. no. 34 at 8, ¶ 50.

12

plagued with difficulty due to significant defects in the Coach.  The Coach remained in repair shops and still had not been fixed.  Plaintiffs "were entitled to believe that they had bargained for a significantly trouble-free [motor home] whose defects could be cured within a reasonable time."  *Page*, 599 So. 2d at 43.  It cannot be disputed that plaintiffs endured repeated attempts to repair and prolonged inconvenience.  *See id*.

This case is analogous to *Page v. Dobbs Mobile Bay, Inc.*, 599 So. 2d 38 (Ala. Civ. App. 1992).  In that case, the plaintiffs purchased a new van, but soon afterwards discovered numerous problems, including

> a steady stream of leaks around the van's windshield and top and around its side and back doors.  There was water damages to the interior.  The [plaintiffs] also discovered that, among other things, the motors controlling the passenger and driver side windows malfunctioned, rubber sealing around the back door had come loose, wall panels and a cabinet were broken, the television set and the interior lights would not work at the same time, the stereo speakers often did not work, molding around the television set was loose, the van rattled badly, the paint on the roof had faded, the gas gauge and the cruise control did not work, the front end was misaligned, and the van used three to five quarts of oil per month.

*Id*. at 40.  Plaintiffs began taking the van for repairs, and the van would stay in the shop for a minimum of two to three days, and sometimes remaining for two weeks.  Once, the van remained in the shop for approximately six weeks.  Although many of the defects were eventually repaired, a number were not.  *See id*.  When the plaintiffs

13

attempted to revoke acceptance, defendant refused to recognize it, and a lawsuit was filed.  With respect to the issue of substantial impairment, the court found that there was ample evidence that the van did not conform with what the plaintiffs were entitled to believe they would receive: "i.e., a reasonably reliable and defect-free new van." 599 So. 2d at 43.  The plaintiffs in this case were similarly entitled to believe they would receive a reliable and defect-free Coach.  Instead, they received a Coach with a substantially impaired value *to them* and, as such, they are allowed to revoke acceptance of that Coach.

Plaintiffs provided evidence of damages pursuant to a revocation of acceptance that total $305,163.20.[58]  Defendant has not challenged any element of this claim for damage in its summary judgment submission, should the court find, as it does, that plaintiffs are entitled to summary judgment.  Accordingly, plaintiffs' motion for summary judgment is due to be granted, and plaintiffs shall have and recover the total amount claimed as damages.[59]

---

[58]*See* doc. no. 31, Exh. 1 at 7.

[59]Because plaintiffs' calculation of damages was based on information available as of the date the cross-motions for summary judgment were filed, plaintiffs may have incurred additional damages up to the date of decision.  If plaintiffs have incurred additional damages, such as in making payments for taxes, insurance, or the loan, plaintiffs may file a motion to alter and amend the judgment to accurately reflect the total damages incurred as of the date of judgment.

## PART FOUR

*Conclusions and Judgment Entry*

For the foregoing reasons plaintiffs' motion for summary judgment (doc. no. 29) is GRANTED, and defendant's motion for summary judgment is DENIED.

It is CONSIDERED, ORDERED, AND ADJUDGED that plaintiffs, Larry and Tanya Floyd, have and recover from defendant, Bankston Motor Homes, Inc., the sum or amount of Three Hundred Five Thousand, One Hundred Sixty-Three Dollars and Twenty Cents ($305,163.20). Costs are taxed to defendant. The clerk is directed to close this file.

DONE this 28th day of September, 2007.

_____
United States District Judge

15